02-09-130-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO.  02-09-00130-CV

 

 


 
 
 Matlock Place Apartments, L.P., JR TX 1, LLC, Hagop
 Kofdarali, Individually, and Robbie L. Sebern Burns, Individually
 
 
  
 
 
 APPELLANTS
 
 
 
 
  
 V.
  
 
 
 
 
 Jeffry Druce, Individually, and as Trustee of the
 Druce Family Living Trust, and Jeffry Druce Properties, LLC
 
 
  
 
 
 APPELLEES
 
 


 

 

----------

 

FROM THE 96th
District Court OF Tarrant COUNTY

----------

 

OPINION

----------

 

I. 
Introduction

          Appellants
Matlock Place Apartments, L.P., JR TX 1, LLC, Hagop Kofdarali, Individually,
and Robbie L. Sebern Burns, Individually appeal the trial court’s judgment
rendered on a jury’s verdict in favor of Appellee Jeffry Druce Properties, LLC
(Druce Properties).[1]  Appellants contend in
four issues and numerous sub-issues that the evidence is legally and factually
insufficient to support the judgment, that the trial court erred by submitting
two jury instructions, that the trial court abused its discretion by excluding
relevant evidence concerning Druce Properties’s damages, and that Druce
Properties failed to properly segregate its attorney’s fees.  We reverse and
render in part and reverse and remand in part.

II. 
Background

A.
Parties

This
appeal involves the Matlock Place Apartments in Arlington, Texas (the property). 
Appellant Matlock Place is a single-asset, Texas limited partnership controlled
by Appellant Hagop “Jack” Kofdarali.  Appellant JR TX 1, LLC is the general
partner of Matlock Place.  Appellee Druce Properties purchased the property from
Matlock Place in July 2004.

Kofdarali
testified at trial that he had been buying, operating, and selling apartment
complexes since 1993.  He assumed ownership responsibilities for the property
in October 2002 when his sister purchased the property out of foreclosure for
approximately $1.3 million,[2] and he retained Legend
Asset Management Company (Legend) to manage the day-to-day tasks at the
property.[3]  Appellant Robbie Burns
is the owner and president of Legend.

Jeffry
Druce is the principal of Druce Properties.  By the time Druce Properties
purchased the property, Druce had been an actor, real estate agent, and real
estate investor in California.  Druce had owned or did own at the time of trial
two rent houses, a home that he rehabilitated and sold, a sixteen-unit apartment
complex, and a thirty-five-unit apartment complex.  He also owned a large
self-storage facility in south Texas.  However, Druce testified that he had
lived at the property during the three and one-half years before trial,
managing the property himself and trying to turn it around.

B.  Matlock
Place’s History

When
Kofdarali’s sister purchased the property, the occupancy rate was between forty
and fifty percent.  Kofdarali testified that the property needed an occupancy
rate in the eightieth percentile to sustain itself financially and that he
believed bad management and lack of funds had caused the low occupancy rate. He
also testified that apartment complexes of this type are challenging because
tenant income is not as high, there is a lot of tenant turnover, and departing
tenants often leave the units damaged.  Kofdarali testified that the property
was in a high crime area, that the property was a “Class D” property or worse
when he started looking at it, but that he was still interested because he
might be able to clean it up and make it profitable.

Between
October 2002 and August 2003, Kofdarali spent more than $500,000 rehabilitating
the property by installing new exterior siding and replacing interior
countertops, carpet, and appliances.  In October 2003, Matlock Place obtained a
loan for $1.8 million, and Kofdarali signed a personal guaranty for the loan. 
Kofdarali used the loan proceeds to pay his sister the $1.3 million purchase
price and to reimburse himself $500,000 for rehabilitation costs and cash flow
shortfalls.  Kofdarali testified that he initially intended to completely
rehabilitate the property but decided to sell it after learning how much a complete
rehabilitation would cost.

Kofdarali
decided in August 2003 to list the property for sale, and he retained Jeff
Dowdle of the Marcus and Millichap firm as broker.[4] 
He knew that the broker would prepare, based on the information he provided, a
marketing brochure to solicit interested buyers.  Burns and Legend provided
operating income and other information to Dowdle for preparation of the
marketing brochure.  Kofdarali testified that he expected readers to believe
the brochure to be accurate as of the time it was created, and he agreed that
the occupancy rate and the accuracy of the rent rolls, rental income, and
property condition were important factors for a buyer.  Kofdarali also
testified that he approved the marketing brochure before Dowdle presented it to
the public.

          The
brochure listed a ninety-three percent occupancy rate, and it stated that there
was “very little deferred maintenance” and that “Major Rehab Just Completed.”  The
brochure also included a disclaimer that stated, “The information contained
herein is not a substitute for a thorough due diligence investigation.”  Kofdarali
testified that occupancy rates fluctuate monthly and could go from ninety-three
to eighty percent within one month.  He also testified that rehabilitation was
not complete at the time, and he denied that the brochure represented that all
major rehabilitation was complete.  Major rehabilitation other than the roof
had been done, but a lot of interior units still needed work.  Kofdarali also
testified that he would never make a purchase decision based on a marketing
brochure because they contain “fluff” intended to make the property look
attractive to potential buyers.  Referring to the marketing brochure, he said,
“No one I know buys off of this.”

          Druce
agreed that marketing brochures are advertising tools and contain
exaggerations, but he testified that he still expected it to be truthful.  He
testified that the marketing brochure contained three materially false
representations:  that there was a ninety-three percent occupancy rate, that
major rehabilitation was complete, and that only minimal deferred maintenance
was required.

Druce
was not the first prospective buyer to express interest in the property.  Two
other prospective buyers had signed contracts before Druce, but neither
contract closed.  Kofdarali testified that he assumed the buyers did not like
what they saw upon conducting their due diligence inspections.  Both contracts
contained a due diligence clause, and Kofdarali testified that he removed the
due diligence clause from the contract with Druce because the legal fees for
negotiating a contract were too expensive since the buyer could back out after
the due diligence period.  He testified that instead of a due diligence clause
in the sale contract itself, he began using letters of intent with a twenty-one
day due diligence period.

C. 
Letter of Intent and Due Diligence Period

Druce
and Kofdarali signed a letter of intent on March 12, 2004.  The purchase price
in the letter of intent was $2.4 million, and the letter of intent included a
twenty-one-day inspection period and a $100,000 credit at closing for “repairs
and maintenance.”

Druce
testified that he personally inspected the property for about four hours after
he had signed the letter of intent.  Present at the inspection were Marcus and
Millichap brokers Dowdle and John Barker and two female Legend employees. 
Burns arrived later.  Druce testified that he asked to see a representative
sample of the units and that he inspected approximately ten of the ninety-nine
units.  He testified that of the ten units he inspected, most were occupied, the
vacant units had only minor damage, and none were uninhabitable. Druce
testified that he did not walk each of the ninety-nine units because the
brochure represented that major rehabilitation had just been completed, because
he thought the other units would look like those he had been shown, and because
he was getting tired and bored.  Druce admitted that he stopped the inspection
and that Dowdle and the Legend employees would have shown him more units if he
had wanted to see them, but he testified that he believed he was being shown a
representative sample of the property.

Druce
testified that he asked Dowdle at the inspection if there were any negatives
that he needed to know about the property, that Dowdle told him there were not,
and that he relied on that representation.  He testified that no one disclosed
to him that, contrary to the marketing brochure, rehabilitation was not
complete, and he said he would have asked to see more units if that had been
disclosed.  Druce also testified that he relied on the statement in the
marketing brochure about deferred maintenance and that he would not have
purchased the property if its true condition had been disclosed; he said that
it had been a major undertaking to make the property livable after he purchased
it.  But Druce acknowledged seeing problems with the foundation, roof, fence,
and landscaping upon inspection and having received documents during due
diligence that disclosed foundation and lighting problems.

The
documents Druce received during the due diligence period were generated by
Legend, and Kofdarali agreed that they were presented to Druce as complete and
accurate.  Druce acknowledged receiving 1,500 to 2,000 pages of documents, but
he testified that he did not notice the crime and delinquent rent problems
revealed by the documents and that were pointed out to him at trial. Druce
testified that he would have been concerned about the high delinquent rent and
prostitution problems pointed out to him at trial, and he agreed that no one
had refused any request for information or access to a unit and that he would
have been aware of this information had he completely reviewed the due
diligence documents.  Druce testified, however, that the information was
“buried” in the stack of paper and that he did not consider that to be full
disclosure.  He testified that he should have been provided a single document
containing negative disclosures on it.  Druce also testified that it is
“worthless” to receive documentation with inaccurate income and occupancy
numbers.

Druce
acknowledged that a buyer must conduct due diligence before purchasing a
property and testified that due diligence is more important than the information
in the brochure.  He testified that a limitation of the seller’s
representations in a marketing brochure or sale contract does not cause him
concern and that, in his opinion, the limitation of the seller’s
representations does not mean the buyer cannot trust the information the seller
provides.  Druce agreed that the buyer should independently investigate the
property, and he acknowledged that he walked the property and received
documentation.  Druce also agreed that the occupancy rates shown on the rent
rolls he received showed that the occupancy rate was no longer ninety-three
percent as represented in the marketing brochure. 

D. 
Sale Contract and Closing

Druce
and Kofdarali entered into the “Contract of Sale” (the contract) on March 24,
2004.  Although the letter of intent provided for a twenty-one day due
diligence period, Druce signed the contract twelve days after signing the
letter of intent.  Druce insisted that the roof be repaired before closing, and
Druce and Kofdarali agreed to split the cost of the new roof with Kofdarali
paying his half of the new roof cost by lowering the purchase price.  Thus,
Druce purchased the property for $2.273 million.  According to Kofdarali, this
amount reflected a purchase price of $2.4 million, a $100,000 credit for
maintenance and repairs, and a $27,000 credit for half of the cost of the new
roof.  Kofdarali testified that Druce negotiated for the $100,000 credit
“because he knew that there was work to be done on this property.”  Druce,
however, testified that he made a $2.3 million offer that Kofdarali accepted
without negotiation and that he did not know where the $100,000 credit came
from.  Kofdarali received $365,484.94 from the sale at closing but testified
that he made no profit on the sale to Druce. 

Druce
closed on the property in late July 2004.  He testified that he visited the
property four or five days before closing and that the property looked
deserted.  During that visit, he learned from an Arlington police officer that
the property was well known in the area for its crime problem and that the
property was full of drug dealers, addicts, and prostitutes.  Druce testified
that no one had disclosed the crime problem to him but testified that he closed
on the property anyway because he was financially and emotionally invested in
it.  Druce testified that he was still excited about the property because the
income stream as represented was “gigantic” and that he thought the income
stream would be even higher once he cleaned up the crime problem.

Druce
acknowledged receiving documents just before closing that showed the occupancy
rate at eighty-seven rather than ninety-three percent, but he testified that he
still believed the marketing brochure to be “substantially true” because the
income stream would have still been significant.  He testified that he would
not have closed had he believed the updated information was not true, but he
admitted that he did not go inside any units to verify the occupancy rate when
he visited the property just before closing.

Kofdarali
testified that Druce received documents at closing, including rent rolls and
operating reports, that reflected $12,000 in delinquent rent.[5] 
Kofdarali acknowledged, however, that he did not personally verify the
information provided to Druce, and he agreed that a buyer would want to know if
twelve to fifteen percent of the units were uninhabitable.  Kofdarali denied
making any representations to Druce about the number of down units and
testified that he did not know the number of down units at closing or how Druce
defined a down unit.[6]

E. 
Accuracy of Documentation

Rosemary
Ocampo began working at the property for Legend shortly before Druce offered to
buy it, and she testified that she was the property manager when Druce
Properties purchased the property.  Ocampo testified that Legend employee
Christina Morrison told her not to remove tenants from the computer system when
they moved out and to only add tenants to the computer system because the
property was for sale.  Ocampo testified on cross-examination, however, that
she did not know how to use the rent roll program and could not have changed the
tenant numbers if she had wanted to.  Ocampo also testified that Morrison told
her to accept every tenant application at the property without conducting
criminal or credit checks because, according to Morrison, they could not show
any vacant units due to the pending sale.  Ocampo testified, “We needed to fill
the property up, so any application that came to the door, we had to move them
in.”

Ocampo
testified that she was aware of the crime problem at the property before Druce
purchased it and that she ultimately stopped working at the property because of
the crime problem.[7]  When she left, she
called Morrison and asked for a job with Legend at another property.  When
asked why she would have worked for Legend again if they had allegedly
falsified documents, she testified that she did not realize what Legend had
done until she was contacted by lawyers several years later.

Morrison
testified that Ocampo was in fact trained to run the rent roll computer program
and knew how to add and remove tenants from the rent roll. Morrison also
testified that there is a difference between accepting all applications and
moving in all applicants.  Apartment complexes cannot discriminate, so they
accept all applications that are given to them but exercise discretion on which
tenants to lease to after verifying the information on the rental application. 
Morrison denied telling Ocampo to falsify documentation, to fill the property
with tenants without conducting background checks, or to not remove tenants
from the rent roll when they moved out, and she testified that not removing
tenants from the rent roll creates a high delinquency rate and causes the
income numbers to look bad.  Morrison also denied being told to not remove
tenants from rent rolls and said she would have quit working for Legend if she
had been so instructed.

Morrison
acknowledged, however, that a comparison of the rent rolls, delinquency
reports, and manager’s reports from September through November 2003 revealed
drastic inconsistencies within the same month.  For example, the September 2003
rent roll listed twelve units as occupied when the September 2003 delinquency
report showed that none of those twelve units was occupied and that some of
those tenants had moved out five months earlier.  Many of the same inconsistencies
existed in the October and November 2003 reports.  The November 2003 rent roll
listed ten vacant units while a November 2003 manager’s report listed eighteen
vacant units.  Morrison admitted that these delinquency reports, rent rolls,
and manager’s reports were among the documents Druce received during due
diligence.

Burns,
Legend’s president, testified that Legend’s policy was to conduct criminal and
credit background checks and that she did not instruct anyone not to check
tenant backgrounds.  Burns also testified that tenants are automatically added
or taken off of the rent rolls by the computer system when they move in or out
and that no one asked her or Legend to falsify documentation or to run the
property differently after Druce signed the contract.[8] 
Kofdarali similarly testified that it is “stupid” to not take tenants off the
rent roll as they move out because it shows up as money or rent owed but not
collected, and he testified that he never instructed anyone to falsify any
documents.

Druce
testified that he would not have purchased the property had he known that the
rent rolls were inaccurate or that tenants had been allowed to live on the
property without any background checks.  He testified that the only reason to
allow bad tenants onto the property is to raise the occupancy rate to sell it
and that he would not do that to someone else.  Druce said that inaccurate
documents prevent prospective buyers from making an informed, intelligent
purchase decision and that Legend’s actions made the property worthless by
representing that the property was making money when it was not.  Druce
testified that he believes the documents he received had been falsified because
of Ocampo’s testimony and because he had not been able during his ownership to duplicate
the income levels represented to him before closing.  Druce also believed that
it was a breach of the contract to provide him with false documents at closing.

F. 
Druce Properties’s Ownership

Ocampo
stayed at the property after Druce Properties purchased it to serve as property
manager for Majestic Realty Management, Druce Properties’s new management
company.  She testified that she walked the entire property with her supervisor
within a week of closing, that there were twelve down units and a total of
twenty-five to thirty vacant units, and that the rent roll Druce received at
closing did not match what they saw.  Burns denied there were that many down
units when Druce Properties purchased the property, but she acknowledged that
it had been a long time since she had walked all of the units. Dowdle, the
Marcus and Millichap broker who represented Kofdarali, testified that he had
walked all but four or five of the units with another prospective buyer just
before Druce decided to buy it, that there were not twelve to fifteen down
units at that time, and that Ocampo’s testimony could not be correct because
there could not have been that much change in only a few months.

Druce
testified that he learned from his property manager that there were sixteen uninhabitable
units at closing.  He also testified that his first two property management
companies quit and that he was continually asked to send money to cover
operating expense shortfalls.  Druce testified that he did not initially send
all the money requested by his management companies because he did not believe
that the property could be suffering financially to that degree.  Druce
defaulted on the mortgage in November or December 2004 and eventually worked
out the problems with the mortgage company, but he testified that he had
personally lived at the property for the three and one-half years before trial,
aggressively managing and trying to turn around the property.

Druce
testified that the occupancy rates during his ownership have fluctuated between
seventy-eight and fifty-eight percent.  He also testified that the physical
condition of the property was much better at the time of trial but that the
property was still losing money.  The crime problem had improved through
diligently investigating tenants before they lease and seeking eviction when
they default.  Druce testified that he had spent approximately $800,000
rehabilitating the property, all in an effort to get the property to at least
break even and that he would not have purchased the property had he known its
true condition.

G. 
Damages and Attorney’s Fees

James
Ryfell, a commercial real estate investor and developer, testified as an expert
witness for Druce Properties.  Ryfell testified that the property had a market
value in 2004 between $1 and $1.1 million.  Druce testified without objection that
the property was worth approximately $1 million when he purchased it.  He based
his opinion on the amount of deferred maintenance required and deducted that
number from Kofdarali’s $1.3 million purchase price from 2002.  Druce later
said that the property was worth $1 million when he purchased it because
Kofdarali had filled it with criminals after purchasing it for $1.3 million. 
Druce admitted on cross-examination, however, that his $1 million estimated
value was actually based on his expert’s opinion and that he had not protested
the significantly higher tax appraisal by Tarrant County.

There
was also evidence that Druce Properties listed the property for sale in 2007
for $2.75 million and that Druce received multiple offers at $2.4 or $2.5
million.  Druce testified, however, that the offers were based on creative
financing arrangements he was not comfortable with and that he fired his broker
based on misrepresentations contained in the marketing brochure.[9]

H.  Jury
Verdict

          At
the close of all evidence, the jury returned a verdict for Druce Properties,
finding that Kofdarali, Matlock Place, Legend, and Burns committed fraud by
nondisclosure and statutory fraud; that Kofdarali, Matlock Place, Legend, and
Burns made a negligent misrepresentation upon which Druce Properties relied;
and that Matlock Place breached the contract.  The jury found that Druce
Properties sustained damages of $973,900 and that Druce Properties should
recover $146,153 in trial attorney’s fees.  The jury also assessed punitive
damages of $1.3 million against Legend.  The trial court subsequently signed a
judgment in accordance with the jury’s verdict.

III. 
Sufficiency of the Evidence

          Appellants
globally contend in their first issue that the evidence is legally and
factually insufficient to support the trial court’s judgment.  We address each
of Appellants’ sub-issues in turn.

A. 
Standards of Review

          1. 
Legal Sufficiency

          We
may sustain a legal sufficiency challenge only when (1) the record discloses a
complete absence of evidence of a vital fact; (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove
a vital fact; (3) the evidence offered to prove a vital fact is no more than a
mere scintilla; or (4) the evidence establishes conclusively the opposite of a
vital fact.  Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334
(Tex. 1998), cert. denied, 526 U.S. 1040 (1999); Robert W. Calvert, “No
Evidence” and “Insufficient Evidence” Points of Error, 38 Tex. L. Rev. 361,
362–63 (1960).  In determining whether there is legally sufficient evidence to
support the finding under review, we must consider evidence favorable to the
finding if a reasonable factfinder could and disregard evidence contrary to the
finding unless a reasonable factfinder could not.  Cent. Ready Mix Concrete
Co. v. Islas, 228 S.W.3d 649, 651 (Tex. 2007); City of Keller v. Wilson,
168 S.W.3d 802, 807, 827 (Tex. 2005).  

Anything
more than a scintilla of evidence is legally sufficient to support the
finding.  Cont’l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex.
1996); Leitch v. Hornsby, 935 S.W.2d 114, 118 (Tex. 1996).  More than a
scintilla of evidence exists if the evidence furnishes some reasonable basis
for differing conclusions by reasonable minds about the existence of a vital
fact.  Rocor Int’l, Inc. v. Nat’l Union Fire Ins. Co., 77 S.W.3d 253,
262 (Tex. 2002).  Any ultimate fact may be proved by circumstantial evidence.  Russell
v. Russell, 865 S.W.2d 929, 933 (Tex. 1993).  A fact is established by
circumstantial evidence when the fact may be fairly and reasonably inferred
from other facts proved in the case.  Id.  However, to withstand a legal
sufficiency challenge, circumstantial evidence still must consist of more than
a scintilla.  Blount v. Bordens, Inc., 910 S.W.2d 931, 933 (Tex. 1995).

2. 
Factual Sufficiency

When
reviewing an assertion that the evidence is factually insufficient to support a
finding, we set aside the finding only if, after considering and weighing all
of the evidence in the record pertinent to that finding, we determine that the credible
evidence supporting the finding is so weak, or so contrary to the overwhelming
weight of all the evidence, that the answer should be set aside and a new trial
ordered.  Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986) (op.
on reh’g); Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); Garza v.
Alviar, 395 S.W.2d 821, 823 (Tex. 1965).

B. 
Damages

Appellants
argue in part of their first issue that the evidence of Druce Properties’s
damages is insufficient because it is conclusory and not supported by any
calculation or methodology.  The jury charge asked the jury to find the
difference between the value of the property as represented and the value of
the property as received, and the jury found the difference to be $973,900.
Appellants challenge both the evidence of value as represented and the evidence
of value as received.

          Appellants
first argue that there is no evidence or factually insufficient evidence they
represented the property had a particular market value and that the “only
evidence was that Matlock [Place] merely sought a particular price.” However,
the August 2003 marketing brochure listed an asking price of $2.5 million, and it
further represented that the property had a ninety-three percent occupancy
rate, annual income of $624,120, and an annual total return before taxes of
$155,597.  Dowdle testified that the numbers in the brochure were intended to
advise a potential buyer how to determine the property’s value, that the
brochure was a representation about how to calculate the property’s value, and
that the “numbers were intended to represent that the 2.5 million dollar asking
price was a fair price.”  From this evidence, the jury could have reasonably
determined that the property’s value as represented was $2.5 million.

          Appellants
also argue there is no evidence or factually insufficient evidence of the
property’s market value as received by Druce Properties in 2004 because the
only evidence offered was conclusory ipse dixit testimony.  Ryfell testified
that he has purchased and sold twenty-five to thirty apartment complexes.  He
first identified several items that he evaluates when considering the purchase
of a Class C property:  whether the roof is flat or pitched, whether the units
have individual electricity meters and water heaters, whether the stairways are
covered or exposed, and whether the air conditioning units are installed in a
way that makes them subject to theft.  Ryfell testified that he next reviews
the income-expense and rent roll documentation to compare against his initial
assessment of the property.

          Ryfell
testified that, in his opinion, the property had a market value between $1 and
$1.1 million in 2004, depending on the integrity of the roof and whether the
air conditioning units were all working.  To support his opinion, Ryfell
testified that he reviewed the operating numbers and rent roll after the sale
date and applied “basic fundamental assumptions of valuation analysis.”  Ryfell
explained that by “basic fundamental assumptions,” he meant (1) determining
gross rent; (2) deducting (a) twenty percent for maintenance; (b) twelve
percent for funds in reserve; and (c) actual expenses such as insurance, employee
salaries, and utilities; and (3) applying a reasonable capitalization rate to
the resulting number.  Ryfell testified that he used Druce Properties’s
operating statements from after the sale to determine the income and expenses
and that he calculated the property’s value to be $1 million.  Thus, Ryfell
identified for the jury the physical and financial aspects of the property that
he considered important in determining its value, and he provided the jury with
his calculation, the source of the numbers inputted into his calculation, and
the result of his calculation.  We hold that Ryfell’s testimony concerning
property value as received is not conclusory.  See Plunkett v. Conn. Gen.
Life Ins. Co., 285 S.W.3d 106, 120 (Tex. App.—Dallas 2009, pet. denied) (“‘A
conclusory statement is one that does not provide the underlying facts to
support the conclusion.’”) (quoting Brown v. Brown, 145 S.W.3d 745, 751
(Tex. App.—Dallas 2004, pet. denied)).  And to the extent that Appellants
contend that Ryfell’s testimony is no evidence of damages because it was based
on assumed facts that differed from actual, undisputed facts, Ryfell testified
that his calculations and market value determination were based on the actual
documentation generated by Druce Properties shortly after it purchased the
property from Matlock Place.  His testimony was not based on assumed facts. 
After applying the appropriate standards of review, we hold that legally and
factually sufficient evidence supports the jury’s damage award.  See Gulf
States Util. Co. v. Low, 79 S.W.3d 561, 566 (Tex. 2002) (stating that the
fact finder “has discretion to award damages within the range of evidence
presented at trial”); Norris v. Jackson, No. 02-09-00265-CV, 2010 WL
4261541, at *5–6 (Tex. App.—Fort Worth Oct. 28, 2010, no pet.) (mem. op.)
(affirming damage award within range of evidence presented at trial on legal
and factual sufficiency grounds).  We overrule this portion of Appellant’s
first issue.

C. 
Disclaimer of Reliance

          Appellants
contend in part of their first issue that the evidence is legally insufficient
to support Druce Properties’s fraud, statutory fraud, and negligent
misrepresentation claims because the disclaimer of reliance clause in the
contract negated Druce Properties’s reliance as a matter of law, thereby
conclusively negating reliance as an essential element of each cause of action.[10]

          1. 
Applicable Law

The
Texas Supreme Court has addressed the enforceability of disclaimer of reliance
clauses on at least three occasions.  See Italian Cowboy Partners, Ltd. v.
Prudential Ins. Co. of Am., 341 S.W.3d 323 (Tex. 2011); Forest Oil Corp.
v. McAllen, 268 S.W.3d 51 (Tex. 2008); Schlumberger Tech. Corp. v.
Swanson, 959 S.W.2d 171 (Tex. 1987).  “The question of whether an adequate
disclaimer of reliance exists is a matter of law.”  Italian Cowboy, 341
S.W.3d at 333 (citing Schlumberger, 959 S.W.2d at 181).  

The Schlumberger
court upheld a disclaimer of reliance clause and determined that there was a
clear intent to disclaim reliance where the contract provided, “[N]one of us is
relying upon any statement or representation by any agent of the parties being
released hereby.  Each of us is relying on his or her own judgment.”  959
S.W.2d at 180.  The court emphasized that the principle that fraud vitiates a contract
must be weighed against the competing concern that parties should be able to
fully and finally resolve their disputes by bargaining for and executing a
release barring all further disputes.  Id. at 179.  Based on this latter
concern, the court held that “a release that clearly expresses the parties’
intent to waive fraudulent inducement claims, or one that disclaims reliance on
representations about specific matters in dispute, can preclude a claim of
fraudulent inducement.”  Id. at 181.  The court further remarked,
however, that a disclaimer will not always preclude a fraudulent inducement
claim.  Id.  

Later,
in Forest Oil, the court upheld a similar disclaimer of reliance clause
that stated in part, “[N]one of [the Plaintiffs and Intervenors] is relying
upon any statement or any representation of any agent of the parties being
released hereby.  Each of the Plaintiffs and Intervenors is relying on his,
her, or its own judgment.”  See 268 S.W.3d at 54 n.4.  The court
identified five facts that it had considered most relevant in Schlumberger
and that were also present in Forest Oil, and the Court listed those
facts as:

(1) the terms of the
contract were negotiated, rather than boilerplate, and during negotiations, the
parties specifically discussed the issue which has become the topic of the
subsequent dispute; 

 

(2) the complaining
party was represented by counsel; 

 

(3) the parties dealt
with each other in an arm’s length transaction; 

 

(4) the parties were
knowledgeable in business matters; and 

 

(5) the release
language was clear.

Id. at
60.

The Forest
Oil court, however, expressly declined to adopt “a per se rule that
a disclaimer automatically precludes a fraudulent-inducement claim” and stated
that its holding “should not be construed to mean that a mere disclaimer
standing alone will forgive intentional lies regardless of context.”  Id. at
61.

Subsequently,
in Italian Cowboy, the court restated the factors and indicated that if
a clear and unequivocal disclaimer of reliance clause is determined to exist,
the analysis then proceeds to the factors that consider the circumstances
surrounding the contract’s formation to determine whether the provision is
binding.  See 341 S.W.3d at 337 n.8.  The clause at issue in Italian
Cowboy stated, “Tenant acknowledges that neither Landlord nor Landlord’s
agents, employees or contractors have made any representations or promises . . .
except as expressly set forth herein.”  Id. at 336.  The court held that
the clause was actually nothing more than a standard merger clause and that if
the parties had actually intended to disclaim reliance, they did not do so by
clear and unequivocal contractual language.  See 341 S.W.3d at 333–34,
336.  The court held that the contractual clause did not bar Italian Cowboy’s
claim for fraudulent inducement because the clause did not meet the elevated
requirement of disclaiming reliance on representations in “clear and
unequivocal language.”  See id. at 336.  And because the parties’
contract did not clearly and unequivocally disclaim reliance, the court did not
consider the remaining Forest Oil factors.  See id. at 337 n.8.

          2. 
Discussion

          The
disclaimer of reliance clause at issue here stated in bold and capital type:

          9.  Limitations of Seller’s Representations and
Warranties

 

Except as otherwise specifically stated in this
contract, Seller hereby specifically disclaims any warranty, guaranty or
representation, oral or written, past, present or future, of, as to, or
concerning (i) the nature and condition of the property, including without
limitation, the water, soil and geology, and the suitability thereof and of the
property for any and all activities and uses which buyer may elect to conduct
thereon, and the existence of any environmental hazards or conditions thereon
(including the presence of asbestos) or compliance with all applicable laws,
rules or regulations; (ii) except for any warranties contained in the deed to
be delivered by seller at the closing, the nature and extent of any
right-of-way, lease, possession, lien, encumbrance, license, reservation,
condition or otherwise; and (iii) the compliance of the property or its
operation with any laws, ordinances or regulations of any government or other
body.[[11]] 
Buyer acknowledges that it will inspect the property and buyer will rely
solely on its own investigation of the property and not on any information
provided or to be provided by seller.  Buyer further acknowledges that the
information provided and to be provided with respect to the property was
obtained from a variety of sources and seller (i) has not made any independent
investigation or verification of such information; and (ii) does not make any
representations as to the accuracy or completeness of such information.  The
sale of the property as provided for herein is made on an “as is” basis, and
buyer expressly acknowledges that, in consideration of the agreements of seller
herein, except as otherwise specified herein, seller makes no warranty or
representation, express or implied, or arising by operation of law, including,
but not limited to, any warranty of condition, habitability, merchantability or
fitness for a particular purpose, in respect of the property. [Emphasis added.] 

Because
the disclaimer of reliance clause must clearly and unequivocally disclaim
reliance, we begin with the fifth Forest Oil factor.  See id.
(listing remaining factors that become relevant if the contract clearly and unequivocally
disclaims reliance).

The
clause at issue in Forest Oil stated in part that the parties were not
“relying upon any statement or any representation of any agent of the parties
being released” and that they were each “relying on his, her, or its own
judgment.”  See 268 S.W.3d at 54 n.4.  The clause at issue in Schlumberger
stated in part that “none of us is relying upon any statement or representation
by any agent of the parties being released hereby” and that “[e]ach of us is
relying on his or her own judgment.”  959 S.W.2d at 180.  The clause at issue
here disclaimed any representations concerning the condition of the property or
the accuracy or completeness of any information provided to Druce Properties,
and the clause expressly provided that Druce Properties would “inspect the
property” and would “rely solely on its own investigation of the property and
not on any information provided or to be provided by seller.”  We hold that the
language of the clause clearly and unequivocally disclaimed Druce Properties’s
reliance.  See Forest Oil, 268 S.W.3d at 60, 62; Schlumberger,
959 S.W.2d at 179, 180–81; cf. Allen v. Devon Energy Holdings, L.L.C.,
No. 01-09-00643-CV, 2011 WL 3208234, at *7–9 (Tex. App.—Houston [1st Dist.]
July 28, 2011, no pet. h.) (holding fraudulent inducement claim not precluded
because contract did not negate reliance on information provided by other party).

          We
now consider the remaining Forest Oil factors.  The first factor
inquires whether the terms of the contract were negotiated and whether the
parties specifically discussed the issues that later became the topic of the
dispute.  See Forest Oil, 268 S.W.3d at 60.  Druce Properties argues
that the contract language was boilerplate and not negotiated because it
appeared in a previous Matlock Place contract and that there was not a dispute
between the parties at the time of contract formation.  While Matlock Place’s
contract with the prior interested buyer did contain an identical disclaimer of
reliance clause, there is evidence that the parties specifically discussed and
negotiated contractual terms to address one of the primary topics disputed at
trial:  the required maintenance and repair of the property.  Druce and
Kofdarali spoke on the telephone before closing and agreed to split the cost of
a new roof, and Kofdarali’s share of the roof cost was deducted from the final
sale price.  Moreover, the letter of intent set forth a $100,000 credit at
closing for “repairs and maintenance,” and Kofdarali testified that Druce
negotiated for the $100,000 credit “because he knew that there was work to be
done on this property.”[12]  Thus, although some of
the evidence is conflicting, the parties specifically discussed and negotiated
the issue of the property’s need for repairs and maintenance when arranging for
the sale of the property.  Thus, on balance, the first Forest Oil factor
favors enforcement.  Compare Baker v. City of Robinson, 305 S.W.3d 783,
796 (Tex. App.—Waco 2009, pet. denied) (declining to enforce disclaimer of
reliance clause and noting that only purchase price was negotiated in parties’
contract), with Worldwide Asset Purchasing, L.L.C. v. Rent-A-Center East,
Inc., 290 S.W.3d 554, 567–68 (Tex. App.—Dallas 2009, no pet.) (enforcing
disclaimer of reliance clause and noting summary judgment evidence reflected
parties exchanged proposed drafts).

          Concerning
representation by counsel, it does not appear that Druce had an attorney assist
with the negotiation of the letter of intent or the contract, but Druce did
obtain, four months after signing the contract, an attorney’s opinion letter
concerning the loan for the property.  Thus, there is conflicting evidence
concerning Druce’s representation by counsel.  Compare Baker, 305 S.W.3d
at 796 (declining to enforce disclaimer of reliance clause and noting
plaintiff’s testimony that “he was not represented by counsel during the
bidding process or at closing”), with RAS Group, Inc. v. Rent-A-Center East,
Inc., 335 S.W.3d 630, 640 (Tex. App.—Dallas 2010, no pet.) (enforcing
disclaimer of reliance clause and noting testimony that parties had attorneys
available to review contract).

Druce
Properties concedes the third factor, which inquires whether the parties dealt
with one another in an arm’s length transaction, and the fourth factor, the
parties’ knowledge in business matters, favors enforcement.  Druce had been a
real estate agent for twenty years and had closed over one hundred properties
for clients, he took a fee for serving as an agent in this transaction, and he
owned two small apartment complexes and a large storage facility when he
entered into the contract.  Although Druce did not have experience with large
apartment complexes equivalent to Kofdarali’s, he did have experience
sufficient to be considered knowledgeable in business matters, particularly
those involving real estate.

          Considering
the Forest Oil factors and the policy reasons for the holdings in Forest
Oil and Schlumberger, we hold that the disclaimer of reliance clause
in the purchase and sale contract precludes Druce Properties’s reliance as a
matter of law.  The contract provides that Druce Properties would rely solely
upon its own investigation and that Matlock Place had not verified any of the
information provided, and at least three of the other four factors weigh in
favor of enforcing the disclaimer of reliance clause.  See McLernon v.
Dynegy, Inc., 347 S.W.3d 315, 332–33 (Tex. App.—Houston [14th Dist.] 2011,
no pet.) (enforcing disclaimer of reliance clause with only “scant” evidence of
extent of representation by counsel and stating that the Forest Oil
considerations are factors rather than elements).  Under the facts of this
case, we hold that the disclaimer of reliance clause is enforceable and that it
precludes Druce Properties’s fraud by nondisclosure, statutory fraud, and
negligent misrepresentation claims against Matlock Place as a matter of law.[13] 
See Forest Oil, 268 S.W.3d at 60–61; see also Schlumberger,
959 S.W.2d at 181 (holding statutory fraud and fraud by nondisclosure claims
barred by disclaimer of reliance clause); RAS Group, Inc., 335 S.W.3d at
640 (holding negligent misrepresentation claim barred by disclaimer of reliance
clause).  We sustain this portion of Appellants’ first issue.

D. 
Justifiable Reliance

Appellants
next argue there is legally insufficient evidence of Druce Properties’s
reliance because “Druce knew sufficient information before signing the contract
and closing to not justifiably rely on the information in the brochure and
complained-of documents.”[14]  Reliance is a necessary
element of Druce Properties’s statutory fraud claim against Appellants.  See
Tex. Bus. & Com. Code Ann. § 27.01(a)(1)(B), (2)(D) (West 2009) (listing
reliance as element of statutory fraud).  We assume without deciding that Druce
Properties’s reliance must have been justifiable.  See Tex. First Nat’l Bank
v. Ng, 167 S.W.3d 842, 856 n.24 (Tex. App.—Houston [14th Dist.] 2005, pet.
granted, judgm’t vacated w.r.m.) (noting “disagreement among Texas courts as to
whether reliance on fraudulent misrepresentation must be justifiable”).

          “In
measuring justifiability, we must inquire whether, ‘given a fraud plaintiff’s
individual characteristics, abilities, and appreciation of facts and
circumstances at or before the time of the alleged fraud[,] it is extremely
unlikely that there is actual reliance on the plaintiff’s part.’”  Grant
Thornton LLP v. Prospect High Income Fund, 314 S.W.3d 913, 923 (Tex. 2010)
(quoting Haralson v. E.F. Hutton Group, Inc., 919 F.2d 1014, 1026 (5th
Cir. 1990)).  In other words, a person may not justifiably rely on a
representation if there are “red flags” indicating such reliance is
unwarranted.  Id. (quoting Lewis v. Bank of Am. NA, 343 F.3d 540,
546 (5th Cir. 2003)).

          Appellants
point to several representations that Druce Properties contends were false, and
they also identify evidence suggesting that Druce was aware of the falsity
before closing.  For example, Appellants note that the marketing brochure and
September 2003 rent roll showed a ninety-three percent occupancy rate.  They
also point to the documents Druce received during due diligence that showed
occupancy rates in the mid-seventies, Druce’s testimony that he knew the brochure
would have exaggerations in it, and Druce’s admission that he knew from walking
the property that a ninety-three percent occupancy rate was too high.  However,
the jury also received evidence that the rent rolls given to Druce showed
occupancy rates of ninety-three, seventy-three, eighty-six, and eighty-six
percent; that the occupancy rates were intentionally inflated because tenants
had not been removed from the rent roll when they had moved out; that Druce
believed at the time of closing, based on the inaccurate information provided
to him, that the occupancy rate was eighty-seven percent; that Druce was
satisfied with an eighty-seven percent occupancy rate; but that the actual
occupancy rate at closing (of which Druce was not aware) was between seventy
and seventy-five percent, with almost half of the vacant units uninhabitable. 
The jury could have reasonably determined that Druce Properties justifiably
relied on Appellants’ representations concerning the occupancy rate.

          Appellants
also attempt to refute the representation in the marketing brochure that said,
“Major Rehab Just Completed.”  In doing so, Appellants point to evidence that
Druce was aware that the property had issues with erosion and needed new paint
and that there were problems with the foundation, roof, lighting, and fence. 
But these items relate to deferred maintenance, not a major rehabilitation. 
For example, Druce testified that when he inspected the property, he asked to
see a representative sample of the units; that he inspected approximately ten
of the ninety-nine units; that of the ten units he inspected, most were
occupied, the vacant units had only minor damage, and none was uninhabitable;
and that his inspection seemed consistent with the representation that major
rehabilitation had just been completed.  Druce also testified that no one
disclosed to him that rehabilitation was not complete and that he would have
asked to see more units if that had been disclosed.  The jury could have
reasonably determined that Druce Properties justifiably relied on Appellants’
representations concerning rehabilitation of the property.

          Appellants
also challenge Druce Properties’s reliance on any representations about crime
problems at the property.[15]  They first point to
evidence that the due diligence documents disclosed crime issues on the
property.[16]  However, the due
diligence documents were described at trial as being 1,500 to 2,000 pages of
documents.  Of those 1,500 to 2,000 pages, a mere seven pages contained short
descriptions of potential crime problems spread over several months and
involving only four of the ninety-nine units.  One weekly manager’s report
stated:  “Resident Problems: Prostitutes”; two weekly manager’s reports stated
that a resident of apartment 212-06 was stealing from a nearby business and
dealing drugs; two weekly manager’s reports stated that too many people were
hanging out at the end of building 204; and two delinquency reports stated that
the resident of apartment 208-04 was “in jail should be here 12-28-[03].”  In
addition, Druce’s knowledge of the crime problem must be viewed in context with
Appellants’ representations about the income stream, which led Druce to believe
that the income stream would increase once the crime problem was resolved.  See
generally City of Keller, 168 S.W.3d at 811 (discussing contextual
evidence).  Thus, even if the trial exhibit accurately represented the
documents Druce received during due diligence, the crime issues noted in the
documents were not so prevalent as to negate justifiable reliance as a matter
of law.  See Allen, 2011 WL 3208234, at *17, 20 (holding lack of
justifiable reliance not conclusively proved despite, among other things,
plaintiff’s knowledge of increased prices before closing).

          Appellants
also point to evidence that all Class C properties have some issues with crime,
that Druce spoke with Morrison about the crime issues before closing, and that
Druce discussed the crime problem with an Arlington police officer four days
before closing and decided to close anyway.  But there is no evidence that
Druce knew crime was a potential problem with Class C properties; in fact,
Druce did know about the necessity of criminal background checks before he
bought the property in 2004.  Furthermore, Druce’s conversation with Morrison
occurred at the same time Druce was speaking with the police officer. Finally,
the conversation with the police officer occurred four days before closing in
July, a time when Druce no longer had an unconditional right to terminate the
contract.[17]  Thus, Druce’s knowledge
before closing does not conclusively negate Druce Properties’s justifiable
reliance.  See id. at *17–20.

          There
is no question that the jury in this case heard conflicting evidence.  As a
reviewing court, we defer to the jury on issues concerning the credibility of
witnesses, the weight to be given to witness testimony, and the resolution of
conflicts in the evidence.  See City of Keller, 168 S.W.3d at 819. 
Applying the appropriate standard of review, we hold that, given Druce’s individual
characteristics, abilities, and appreciation of the facts and circumstances at
or before the time of Appellants’ misrepresentations, legally sufficient
evidence supports the jury’s finding that Druce Properties justifiably relied
on Appellants’ representations.  See Grant Thornton L.L.P., 314 S.W.3d
at 923; Cent. Ready Mix Concrete Co., 228 S.W.3d at 651; City of
Keller, 168 S.W.3d at 807, 827.  We overrule this portion of Appellants’
first issue.

E.  Scienter

          Appellants
also contend in their first issue that the evidence supporting Kofdarali’s and
Burns’s individual liability is legally and factually insufficient.
Specifically, Appellants argue there is “no evidence that Kofdarali or Burns
communicated any false statement on which Druce Properties relied or that
[Kofdarali and Burns] had any scienter making such statements.”  Appellants do
not contest that Kofdarali and Burns would be personally liable for their own
fraudulent or tortious acts.  See Miller v. Keyser, 90 S.W.3d 712, 717
(Tex. 2002).  Instead, they argue the evidence is insufficient to sustain that
individual liability.

          1. 
Kofdarali

          The
jury found that Kofdarali committed statutory fraud.  The court’s charge
defined statutory fraud as follows:

A party commits
statutory fraud if:

 

a.    there is a false
representation of a past or existing material fact,

 

b.    the false
representation is made to a person for the purpose of inducing that person to
enter into a contract, and

 

c.   
the
false representation is relied on by that person in entering into that contract.

Because
Appellants did not object to the language of this instruction, we measure the
sufficiency of the evidence based on this instruction as submitted to the jury.[18] 
See Wal-Mart Stores, Inc. v. Sturges, 52 S.W.3d 711, 715 (Tex. 2001); City
of Fort Worth v. Zimlich, 29 S.W.3d 62, 71 (Tex. 2000).

Appellants
argue that Kofdarali did not correspond with Druce, personally spoke with Druce
only one time concerning the roof, and did not have knowledge that any
representations to Druce were false.  But Appellants ignore evidence favorable
to the jury’s statutory fraud finding against Kofdarali.  For example, the
evidence reflects that Kofdarali decided to sell the property upon determining
that the cost to rehabilitate it was too great.  Kofdarali admitted that the
rehabilitation was not complete, and other evidence reflected that the property
required substantial deferred maintenance after Druce purchased it. 
Furthermore, Kofdarali personally approved the marketing brochure, a document
that he knew buyers would believe to be accurate and that represented that the
property required “very little deferred maintenance” and stated, “Major Rehab
Just Completed.”  Applying the appropriate standards of review, we hold that
legally and factually sufficient evidence supports the jury’s finding that
Kofdarali committed statutory fraud, and we overrule this part of Appellant’s
first issue.

2. 
Burns

The
jury similarly found that Burns committed statutory fraud.  Appellants argue
that Burns cannot be individually liable because she did not forward any
documents directly to Druce and did not perform the data entry that led to the
inflated occupancy rates.  Appellants also point out that Druce described Burns
as being very helpful when he spoke with her and that Druce testified that he
did not remember relying on anything Burns told him when purchasing the
property. However, there is evidence that Burns specifically told Druce during
the due diligence period that the crime was “your standard loud noise . . .
which you get in almost all apartment complexes.”  But Burns testified at trial
that crime is a problem at the property.  Furthermore, although Druce testified
that he did not recall anything from Burns that he relied on when purchasing
the property, he also testified that no one told him about the crime problem
before he spoke with the police officer four days before closing and that the
crime problem was so bad that there was a murder on the property five months
after he bought it.  Given that Burns made the false representation concerning
the crime problem during the due diligence period, it can be inferred from the
circumstances that she made the representation with the intent that Druce
Properties rely on it and enter into the contract.  See Johnson &
Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 526 (Tex.
1998) (“Proof that a defendant made a statement knowing of its falsity or
without knowledge of its truth may be proved by direct or circumstantial
evidence.”); Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 434–35
(Tex. 1986) (“Intent is a fact question uniquely within the realm of the trier
of fact because it so depends upon the credibility of the witnesses and the
weight to be given to their testimony.”); Hannon, Inc. v. Scott, No.
02-10-00012-CV, 2011 WL 1833106, at *6 (Tex. App.—Fort Worth May 12, 2011, pet.
denied) (mem. op.) (“Intent may be inferred from a party’s actions before and
after the fraudulent conduct.”).  Furthermore, the spoliation instruction in
the jury charge permitted an inference that the destroyed data would have been
unfavorable to Burns.  See Tony Gullo Motors I, L.P. v. Chapa, 212
S.W.3d 299, 306 (Tex. 2006) (“Spoliation of evidence normally supports an
inference only that the evidence was unfavorable, not that it was created ab
initio with fraudulent intent.  But as the evidence here was part of the
original contracting process, it provides some circumstantial evidence of fraud
in that process.”).

Again,
the jury in this case clearly heard conflicting evidence.  But we must as a
reviewing court defer to the jury’s determinations of credibility, weight, and
conflicts in the evidence.  See City of Keller, 168 S.W.3d at 819. 
Therefore, applying the appropriate standards of review, we hold that legally
and factually sufficient evidence supports the jury’s finding that Burns
committed statutory fraud, and we overrule this part of Appellant’s first
issue.[19]

F. 
Economic Loss Rule

          Appellants
also argue in their first issue that Druce Properties’s only alleged damages
arise from a contract and that Druce Properties therefore cannot maintain a
tort cause of action for the same damages.

As
we stated in Heil Co. v. Polar Corp., 

Although
a party’s actions may breach duties in tort, contract, or both, Texas has long
recognized that “mere nonfeasance under a contract creates liability only for
breach of contract.”  Crawford v. Ace Sign, Inc., 917 S.W.2d 12, 13
(Tex. 1996); Jim Walter Homes, Inc. v. Reed, 711 S.W.2d 617, 618 (Tex. 1986).
 “When the injury is only the economic loss to the subject of a contract
itself, the action sounds in contract alone.”  Reed, 711 S.W.2d at 618.  Thus,
tort damages are generally not recoverable unless the plaintiff suffers an
injury that is independent and separate from the economic losses recoverable under
a breach of contract claim.  See Formosa Plastics Corp. USA v. Presidio Eng’rs
& Contractors, Inc., 960 S.W.2d 41, 45–47 (Tex. 1998); Sw. Bell Tel.
Co. v. DeLanney, 809 S.W.2d 493, 494 (Tex. 1991) (analyzing both the source
of the duty and the nature of the remedy in determining a claim’s
characterization as sounding either in contract or tort); see also Fed. Land
Bank Ass’n v. Sloane, 825 S.W.2d 439, 442–43 (Tex. 1991) (adopting
independent injury requirement of section 552B of the Restatement (Second) of
Torts).  The supreme court in Formosa, however, declined to apply the
independent injury requirement to a fraudulent inducement claim.  Formosa,
960 S.W.2d at 47.

191
S.W.3d 805, 815–16 (Tex. App.—Fort Worth 2006, pet. denied).

Appellants
do not dispute that the economic loss rule does not apply to claims for
fraudulent inducement.  Instead, they mistakenly argue that Druce Properties
did not assert a fraudulent inducement claim.  Contrary to Appellants’
contention, Druce Properties’s pleading included an allegation that Appellants
made “representations with the intent of inducing Druce to enter into and close
the sale of” the property, and the jury found in response to the statutory
fraud question that Appellants had made false representations “for the purpose
of inducing [Druce Properties] to enter into a contract.”  Druce Properties’s
statutory fraud claim was therefore based on fraudulent inducement, and the
economic loss rule does not bar Druce Properties’s statutory fraud tort
damages.  See id.; see also Formosa, 960 S.W.2d at 47; Reservoir
Sys., Inc. v. TGS-NOPEC Geophysical Co., L.P., 335 S.W.3d 297, 308 (Tex.
App.—Houston [14th Dist.] 2010, pet. denied) (“Tort damages are recoverable for
a fraudulent-inducement claim irrespective of whether the fraudulent
representations are later subsumed in a contract or whether the plaintiff only
suffers an economic loss related to the subject matter of the contract.”).  We
overrule this part of Appellant’s first issue.

G. 
Breach of Contract

          In
the final part of their first issue, Appellants argue that the evidence is
legally and factually insufficient to support Druce Properties’s claim for
breach of contract against Matlock Place.

          Druce
Properties contended at trial and argues on appeal that Matlock Place breached
the contract by providing falsified rent rolls.  The contractual provision at
issue provided as follows:

7.  SUBMISSION
MATTERS:  Buyer acknowledges receipt of the following materials and waives any
contingency attached to these documents.

 

. . .

 

(f)  a rent roll of a
recent date;

 

. . .

          

Seller
makes no representation or warranty, expressed or implied, as to the accuracy
or completeness of the information contained in the Submission Matters except
that Seller has delivered all such items in Seller’s actual possession.

          Appellants
interpret this provision as a mere acknowledgement of a past act that could not
be breached.  Druce Properties responds that the letter of intent allowed Druce
twenty-one days “to inspect the subject property and perform due diligence on
all records” and that Appellants continued providing Druce with documents after
the contract was signed.  Thus, Druce Properties argues that this triggered an
implied contractual obligation of cooperation.  But the contract contained a merger
clause providing that it superseded all “prior understandings or written or
oral agreements between the parties.”  See, e.g., Springs Window
Fashions Div., Inc. v. Blind Maker, Inc., 184 S.W.3d 840, 870 (Tex.
App.—Austin 2006, pet. granted, judgm’t vacated w.r.m.) (“A merger clause . . .
memorializes the parties’ intent to integrate or absorb their prior
negotiations, agreements, or understandings concerning the same subject matter
into a subsequent written contract.”).  Thus, Druce Properties cannot rely on
the letter of intent to support an obligation by Matlock Place to provide an
accurate rent roll.

          Druce
Properties also argues that the contract included an implied duty to perform
the contract with care, skill, reasonable expedience, and faithfulness.  But
the cases upon which Druce Properties relies do not support its contention.  See
Bank One, Tex. N.A. v. Stewart, 967 S.W.2d 419, 434 (Tex. App.—Houston
[14th Dist.] 1998, pet. denied) (declining to interpret implied covenant to
cooperate into bailment agreement); see also Montgomery Ward & Co. v.
Scharrenbeck, 146 Tex. 153, 157, 204 S.W.2d 508, 510 (1947) (recognizing
implied contractual duty to perform services contract without
negligence); Jones v. Star Houston, Inc., 45 S.W.3d 350, 355 (Tex. App.—Houston
[1st Dist.] 2001, no pet.) (acknowledging implied duty to perform services
contract with ordinary care).

          Moreover,
Texas courts look “beyond the written agreement to imply a covenant only if
necessary to effectuate the intention of the parties as disclosed by the
contract as a whole, but not to make the contract fair, wise, or just.”  Stewart,
967 S.W.2d at 434 (citing Nalle v. Taco Bell Corp., 914 S.W.2d 685, 687
(Tex. App.—Austin 1996, writ denied)).  “An implied covenant is necessary to
effectuate the parties’ intentions only if the obligation is ‘so clearly within
the contemplation of the parties that they deemed it unnecessary to express it.’” 
Id. (quoting Nalle, 914 S.W.2d at 687).  Furthermore, “‘[t]here
can be no implied covenant as to a matter specifically covered by the written
terms of the contract.’”  Id. at 434–35 (quoting Texstar N.A., Inc.
v. Ladd Petroleum Corp., 809 S.W.2d 672, 678 (Tex. App.—Corpus Christi 1991,
writ denied)).  Here, the contract provision upon which Druce Properties relies
merely acknowledges that Druce received the documentation, and the provision
expressly disclaimed any representation or warranty concerning the accuracy or
completeness of the information.  Druce Properties does not dispute that Druce
received a rent roll and contends only that the rent roll was not accurate.  In
this scenario, we are not free to imply a covenant into the contract to make it
fair or just.  See id.  We hold that there is legally insufficient
evidence to support the jury’s finding that Matlock Place breached the
contract, and we sustain this portion of Appellant’s first issue.

IV. 
Jury Charge Instructions

          Appellants
contend in their second issue that the trial court erred by submitting two jury
instructions.  The first instruction concerned spoliation of evidence, and the
second concerned the “as is” clause in the contract.

A. 
Spoliation Instruction

          Appellants
argue that the trial court erred by submitting a spoliation instruction because
there was no evidence to support it.[20]

          1. 
Applicable Law

          “A
spoliation instruction is an instruction given to the jury outlining
permissible inferences they may make against a party who has lost, altered, or
destroyed evidence.”  Tex. Elec. Coop. v. Dillard, 171 S.W.3d 201, 208
(Tex. App.—Tyler 2005, no pet.); Brewer v. Dowling, 862 S.W.2d 156, 159
(Tex. App.—Fort Worth 1993, writ denied).  The use of a spoliation instruction
is generally limited to two circumstances: (1) the deliberate destruction of
relevant evidence; and (2) the failure of a party to produce relevant evidence
or to explain its non-production.  Wal-Mart Stores, Inc. v. Johnson, 106
S.W.3d 718, 721 (Tex. 2003) (citing Anderson v. Taylor Publ’g Co., 13
S.W.3d 56, 61 (Tex. App.—Dallas 2000, pet. denied)).  Under the first circumstance,
a party who has deliberately destroyed evidence is presumed to have done so
because the evidence was unfavorable to its case.  Id. at 721–22 (citing
Williford Energy Co. v. Submergible Cable Servs., Inc., 895 S.W.2d 379,
389–90 (Tex. App.—Amarillo 1994, no writ), and Brewer, 862 S.W.2d at
159).  Under the second circumstance, the presumption arises because the party
controlling the missing evidence cannot explain its failure to produce it.  Id.
at 722 (citing Watson v. Brazos Elec. Power Coop., Inc., 918 S.W.2d 639,
643 (Tex. App.—Waco 1996, writ denied)).

A
trial court may be guided by the following three factors in determining whether
a spoliation presumption is justified: (1) whether there was a duty to preserve
evidence; (2) whether the alleged spoliator either negligently or intentionally
spoliated evidence; and (3) whether the spoliation prejudiced the nonspoliator’s
ability to present its case or defense.  Trevino v. Ortega, 969 S.W.2d
950, 954–55 (Tex. 1998) (Baker, J., concurring).

We
review the submission of a spoliation instruction under an abuse of discretion
standard.  Crescendo Invs., Inc. v. Brice, 61 S.W.3d 465, 479 (Tex.
App.—San Antonio 2001, pet. denied); see Johnson, 106 S.W.3d at 722–23; Conditt
v. Morato, No. 02-06-00214-CV, 2007 WL 2693968, at *3 (Tex. App.—Fort Worth
Sept. 13, 2007, pet. denied) (mem. op.).

          2. 
Discussion

The
instruction at issue stated:

Spoliation
of evidence occurs in two circumstances when a party knew or should have known
that certain evidence is relevant:  (1) the deliberate destruction of the
relevant evidence or (2) the failure of a party to produce the relevant
evidence or to explain its non-production.  In either situation, a presumption
arises that the evidence was unfavorable to the party who committed spoliation.

Appellants
first argue that they did not have a duty to preserve evidence because they
were not on notice of Druce Properties’s claim when the documents were
destroyed.  Before any failure to produce material evidence may be viewed as
discovery abuse, the opposing party must establish that the nonproducing party
had a duty to preserve the evidence in question.  Dillard, 171 S.W.3d at
209 (citing Johnson, 106 S.W.3d at 722).  There must be a sufficient
foundational showing that the party who destroyed the evidence had notice both
of the potential claim and of the evidence’s potential relevance thereto.  Dillard,
171 S.W.3d at 209 (citing Johnson, 106 S.W.3d at 722).

Druce
Properties filed this lawsuit in March 2006, and Appellants filed their answer
in April 2006.  Druce Properties, in September 2006, requested that Appellants
produce documents and data, including that in electronic form, relating to the
occupancy, management, and improvement of the property.  In November and
December 2006, Druce Properties sent notices for the depositions of Kofdarali
and Burns, both of which included requests for production of the same type of
documents and data.  Despite these document requests, Appellants did not
respond to the requests for production until late-December 2007.  In their
December 28, 2007 request for production response, Burns and Legend responded
as follows:

My
records for this time period are no longer in existence.  These records would
have been kept on computers and were stored at my offices in Arlington.  Those
offices burned in June 2007, causing a loss of all data.  However, the records
were provided previously to Marcus & Millichap and have been produced to
Plaintiffs in that litigation.  I would refer Plaintiffs to the documents, which
reflect these numbers.

Kofdarali
and Matlock Place’s response was virtually identical but also stated:  “To the
extent the documents were previously provided to me, those records were not
maintained after the sale of the property, as is our standard.”

At
trial, Kofdarali testified that it is his standard practice to destroy all
paper copies relating to a property once the tax return has been completed.  Thus,
because the property sold in 2004, he destroyed any remaining paper copies
after completing the 2004 taxes during the year 2005.  But Kofdarali also
testified that he was aware in 2006 of Druce Properties’s document request and
that he knew the document request sought both paper and electronic copies.  And
Kofdarali confirmed that he and the other appellants did not respond to the
pre-fire discovery requests for more than a year and until well after the June
2007 fire.  However, Kofdarali also testified that he and Burns discussed the
spoliation issue the night before he testified and discovered that there would
not have been any data about the property on Legend’s computers at the time of
the fire because Legend stopped paying the software company for access to the
electronic data relating to the property shortly after Druce Properties
purchased the property.  Burns testified similarly and added that Legend would
have “boxed up” any paper documents in its possession after the sale and sent
them to Kofdarali within ninety days of the sale.  However, Burns testified
both that after a sale, Legend “delete[s] a lot of stuff off of our system
simply to free up space” and that the data “stays on that computer” but is
inaccessible once the software license is not renewed.

On
appeal, Appellants maintain they had no duty to preserve evidence because the
paper copies were destroyed in 2005 before they had notice of a claim and that
the electronic copies were inaccessible in 2004 once Legend stopped paying the
software licensing fee.  But Appellants ignore the inconsistencies in their
pretrial and trial positions.  Druce Properties requested documents, paper or
electronic, from Appellants in September 2006, and Appellants did not respond
to Druce Properties’s document request until December 28, 2007.  In the
meantime, according to Kofdarali and Burns, a fire destroyed the computers
stored at Legend’s corporate office.  However, Druce Properties could have
inspected the actual computers had Appellants not delayed in responding to the
document requests, and the June 2007 fire would not have been an issue. 
Further, if Legend in fact deleted electronic files shortly after the sale,
Appellants could have said as much in their initial discovery response, and
neither the fire nor the decision not to maintain the software license would
have been an issue.  Appellants instead chose to initially rely on the fire
without mentioning the inconsistent explanations of deleting electronic files
and not maintaining the software license.  Because of Appellant’s inconsistent
and changing explanations, we cannot say the trial court abused its discretion
by determining that Appellants had a duty to preserve relevant evidence.  See
generally Cresthaven Nursing Residence v. Freeman, 134 S.W.3d 214, 228
(Tex. App.—Amarillo 2003, no pet.) (holding that inconsistencies in testimony
and paper records, among other things, provided more than a scintilla of
evidence to support submission of spoliation instruction).

Appellants
also argue that there is no evidence that the destroyed documents would have
helped Druce Properties’s case.  To determine whether the spoliation hindered
Druce Properties’s ability to present its case, we look to a variety of
circumstances such as the relevancy of the missing evidence and the
availability of other evidence to take the place of the missing information.  See
Trevino, 969 S.W.2d at 958 (Baker, J., concurring).  Ocampo testified that
Morrison told her not to remove tenants from the rent roll when they moved out,
and the rent rolls and internal reports, which showed significantly different
occupancy rates only days apart, arguably supported Ocampo’s testimony.  Had
the data at issue not been destroyed, it could have further confirmed Ocampo’s
testimony.  Although this on first blush suggests that any destroyed data would
have merely been cumulative of other evidence in the record, we note that the
case was hotly contested on all liability issues.  The existence of additional
evidence showing that income and occupancy rates had been intentionally altered
could have significantly aided the presentation of Druce Properties’s case. 
And to the extent that we cannot determine with certainty what else the data
might have shown, we are unable to do so because Appellants destroyed it.  See
Brookshire Bros., Ltd. v. Aldridge, No. 12-08-00368-CV, 2010 WL 2982902, at
*7–8 (Tex. App.—Tyler July 30, 2010, pet. filed) (mem. op.) (holding spoliation
prejudiced plaintiff because remaining portion of video showed only part of
events relevant to plaintiff’s accident).  We therefore hold the trial court
did not abuse its discretion by determining that the missing evidence
prejudiced Druce Properties’s ability to present its case.  We overrule this
part of Appellants’ second issue.

B. 
“As Is” Instruction

          Appellants
argue in the remainder of their second issue that the trial court erred by
submitting a jury instruction concerning the “as is” clause in the contract.

1. 
Applicable Law

The
trial court “shall submit such instructions and definitions as shall be proper
to enable the jury to render a verdict.”  Tex. R. Civ. P. 277.  An instruction
is proper if it (1) assists the jury, (2) accurately states the law, and (3)
finds support in the pleadings and evidence.  Transcon. Ins. Co. v. Crump,
330 S.W.3d 211, 221 (Tex. 2010) (quoting Union Pac. R.R. Co. v. Williams,
85 S.W.3d 162, 166 (Tex. 2002)).  Generally, we review the trial court’s
decisions on how to charge the jury for an abuse of discretion; however, when
the appellant challenges an instruction or definition as legally incorrect, we
review the instruction or definition de novo.  Id.; St. Joseph Hosp.
v. Wolff, 94 S.W.3d 513, 525 (Tex. 2002).  If the charge is legally
correct, the trial court has broad discretion regarding the submission of
questions, definitions, and instructions.  Hyundai Motor Co. v. Rodriguez,
995 S.W.2d 661, 664 (Tex. 1999).

2. 
Discussion

The
trial court submitted the following instruction to the jury:

A buyer is not bound
by an agreement to purchase something “as is” if he has been induced to enter
into an agreement because of a fraudulent representation or concealment of
information by the seller.

          Appellants
first argue that this instruction is legally incorrect.[21] 
Appellants do not dispute that the instruction as given correctly states the
rule as set forth in Prudential Insurance Co. of America v. Jefferson Associates.,
Ltd., 896 S.W.2d 156, 162 (Tex. 1995) (“A buyer is not bound by an
agreement to purchase something ‘as is’ that he is induced to make because of a
fraudulent representation or concealment of information by the seller.”). 
Instead, Appellants cite Forest Oil and contend that the instruction was
legally incorrect because it “completely leaves out necessary and corresponding
language from the Texas Supreme Court that the waiver language in the ‘as is’
clause can be enforceable and can negate reliance.”

          We
held above that the disclaimer of reliance clause in the contract is
enforceable.  In light of that holding, we agree with Appellants that the “as
is” instruction is an incorrect statement of the law.  In Forest Oil and
Schlumberger, the supreme court held that a disclaimer of reliance
clause is enforceable if the disclaimer clause’s language clearly and
unequivocally disclaims reliance on the other party’s representations and if
other circumstances are present.  Forest Oil, 268 S.W.3d at 60–61; Schlumberger,
959 S.W.2d at 179–81.  If the clear and unequivocal language appears in the
parties’ agreement, as it does in this case, and the other circumstances are
present, as they are in this case, it is not legally correct to instruct the
jury that a “buyer is not bound by an agreement to purchase something ‘as is’
if he has been induced to enter into an agreement because of a fraudulent
representation or concealment of information by the seller.”  See Forest
Oil, 268 S.W.3d at 60–61; Schlumberger, 959 S.W.2d at 179–81; see
also Halmos v. Bombardier Aerospace Corp., 314 S.W.3d 606, 617 (Tex.
App.—Dallas 2010, no pet.) (“An instruction that misstates the law as
applicable to the facts or misleads the jury is improper.”).  The trial court
therefore erred by submitting a legally incorrect instruction to the jury.

3. 
Harmful Error

To
obtain reversal of a judgment based upon an error in the trial court, the
appellant must show that the error occurred and that it probably caused
rendition of an improper judgment or probably prevented the appellant from
properly presenting the case to this court.  Tex. R. App. P. 44.1(a); Romero
v. KPH Consolidation, Inc., 166 S.W.3d 212, 225 (Tex. 2005).  “‘Charge
error is generally considered harmful if it relates to a contested, critical
issue.’”  Crump, 330 S.W.3d at 225 (quoting Columbia Rio Grande
Healthcare, L.P. v. Hawley, 284 S.W.3d 851, 856 (Tex. 2009)). 
Unless the appellate court is reasonably certain that the jury was not
significantly influenced by issues erroneously submitted to it, the error is
reversible.  Romero, 166 S.W.3d at 227–28.

Here,
all issues in the case were hotly contested, especially liability for fraud,
and the evidence presented a close case that the jury could have legitimately
decided in favor of either Druce Properties or Appellants.  Furthermore, we
have held that Druce Properties’s claims against Matlock Place are either
barred by the disclaimer of reliance clause or not supported by legally
sufficient evidence.  Therefore, we cannot be reasonably certain that the jury
was not significantly influenced by the trial court’s submission of this
legally incorrect instruction.  Thus, the trial court’s error was harmful, and
we sustain this portion of Appellants’ second issue.[22]

V. 
Conclusion

          Having
sustained in part and overruled in part Appellants’ first issue, having
sustained in part and overruled in part Appellants’ second issue, and having
not reached the remainder of Appellants’ issues, we reverse the portion of the
trial court’s judgment relating to Druce Properties’s claims against Matlock
Place and render judgment that Druce Properties take nothing against Matlock
Place.  We also reverse the remainder of the trial court’s judgment and remand
this case for a new trial consistent with this opinion.

 

 

ANNE GARDNER
JUSTICE

 

PANEL: 
DAUPHINOT,
GARDNER, and WALKER, JJ.

 

DAUPHINOT,
J. dissents without opinion.

 

DELIVERED:  January 12, 2012









[1]Jeffry Druce,
Individually, and as Trustee of the Druce Family Living Trust, was also a
plaintiff in the trial court, but the trial court granted a directed verdict
against Druce in both capacities.  Druce has not appealed the trial court’s
directed verdict but was listed by the parties as an appellee in this court.





[2]Kofdarali testified that
his sister purchased the property because the selling bank required a quick
closing with all cash.





[3]Legend was also a
defendant in the trial court.  However, the trial court severed the claims
against Legend after Legend filed for bankruptcy.  Legend is therefore not a
party to this appeal.





[4]Kofdarali testified that
he personally made the decision to sell even though his sister still owned the
property at that time. 





[5]Druce did not dispute
receiving and having an opportunity to review the documents exchanged at
closing.





[6]Kofdarali testified that a
down unit is uninhabitable and “requires just about everything:  carpet,
appliances, cabinets, plumbing, doors.”  Druce testified that a down unit is
one that cannot be lived in and requires more than relatively minor repairs.





[7]There was a murder on the
property five months after Druce purchased it.





[8]Burns testified that
Legend was paid a percentage of actual collections, not a percentage of
forecasted income, for serving as property manager and that Legend received
more money if the property collected more rent.  She also testified that Legend
did not receive any compensation from the sale to Druce.





[9]Druce’s broker, Clifford
Stratton, testified that Druce reviewed, edited, and approved the brochure
before it was shown to the public.





[10]Appellants preserved this
issue by motion for directed verdict and motion for judgment notwithstanding
the verdict, both of which were denied by the trial court.





[11]Druce Properties argues
there is a comma rather than a period after “other body,” but a review of the
best available copy and a comparison to Matlock Place’s contract with a
previous potential buyer confirm that the punctuation mark is actually a
period.





[12]As set forth in the
factual background section, Kofdarali and Druce gave conflicting testimony about
negotiating the maintenance and repair credit in the letter of intent.





[13]By our holding, we
necessarily disagree with Druce Properties’s implication that a disclaimer of
reliance clause is enforceable only if it is contained in a settlement
agreement.  In Italian Cowboy, the Supreme Court addressed the
disclaimer of reliance clause argument as it related to a restaurant lease
agreement.  See 341 S.W.3d at 331–37.  Moreover, courts of appeal have
not limited the application of disclaimer of reliance clauses to settlement
agreements.  See RAS Group, Inc., 335 S.W.3d at 633 (contract for
purchase of delinquent credit accounts); Baker, 305 S.W.3d at 786
(contract for sale of real property); Worldwide Asset Purchasing, L.L.C.,
290 S.W.3d at 567–69 (contract for purchase of delinquent credit accounts); see
also Allen, 2011 WL 3208234, at *2–4 (stock redemption agreement).





[14]Appellants do not
challenge Druce Properties’s reliance on factual sufficiency grounds.  Furthermore,
because we have held that the disclaimer of reliance clause is enforceable in
favor of Matlock Place, the following discussion of Druce Properties’s
misrepresentation claims relates only to Kofdarali and Burns.





[15]Druce testified that no
one told him about the crime problem, and Dowdle testified that Burns told
Druce during the due diligence period that the crime issues were nothing more
than loud noise that is typical of apartment complexes.





[16]There is some question
whether the trial exhibit representing the due diligence documents accurately
reflects the information provided to Druce.  Druce testified that the trial
exhibit contained internal Legend documents that had not been provided to him.





[17]The contract, signed in
March, gave Druce the right to terminate the contract if he knew that Matlock
Place had made a false representation or warranty concerning Matlock Place’s
“right, power and authority to sell and convey the Property”; Matlock Place’s
payment of “taxes, charges, debts, and other assessments” through 2004; or the
existence of unrecorded liens that would not be satisfied by the sale.  None of
these relates to the representations at issue in this case.





[18]The statutory fraud
question included a second instruction defining statutory fraud in the context
of a false promise to do an act.  We do not address the sufficiency of the
evidence based on that instruction in light of our conclusion as to the
instruction quoted above.  See generally Tex. R. App. P. 47.1.





[19]Because we have affirmed
the sufficiency of the evidence supporting the jury’s statutory fraud findings
against Kofdarali and Burns, we need not address Druce Properties’s claims for
fraud by nondisclosure and negligent misrepresentation.  See Tex. R.
App. P. 47.1.





[20]To the extent
Appellants argue that the spoliation instruction was an incorrect statement of
law, they did not present that contention to the trial court by objecting to
the jury charge.  Appellants therefore failed to preserve that argument for
appellate review.  See Tex. R. App. P. 33.1(a); Tex. R. Civ. P. 272; see
also Wackenhut Corp. v. Gutierrez, No. 04-10-00661-CV, 2011 WL 3915630, at
*2 (Tex. App.—San Antonio Sept. 7, 2011, no pet. h.) (mem. op.) (holding
spoliation complaint not preserved due to failure to object to charge
instruction).





[21]Appellants preserved this
complaint for appellate review by objecting to the submission of the
instruction before it was submitted to the jury.  See Ford
Motor Co. v. Ledesma, 242 S.W.3d 32, 43–44 (Tex. 2007); State
Dep’t of Highways & Pub. Transp. v. Payne, 838 S.W.2d 235, 241 (Tex.
1992) (op. on reh’g); see also Tex. R. Civ. P. 274.





[22]Because we sustain this
portion of Appellants’ second issue and must therefore remand for a new trial,
we do not address Appellants’ third issue (in which they contend that the trial
court erred by excluding evidence of Druce Properties’s damages) or Appellants’
fourth issue concerning attorney’s fees.  See Tex. R. App. P. 47.1.